**William JOHN, Petitioner–Appellant,**

v.

**UNITED STATES PAROLE COMMIS-SION, Respondent–Appellee.**

**No. 96–16418.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1997.

Decided Sept. 10, 1997.

Michael D. Gordon, Asst. Federal Public Defender, Phoenix, Arizona, for petitioner-appellant.

Paul K. Charlton, Asst. U.S. Atty., Phoenix, Arizona, for respondent-appellee.

Before: HALL and WIGGINS, Circuit Judges, and SHADUR, District Judge. *

SHADUR, District Judge:

After he had served about one-fifth of his long-term custodial sentence stemming from a 1976 federal conviction for sexual assault, William John ("John") was granted parole. Something over three years later John was sentenced to a prison term by a New Mexico state court following his guilty plea to a similar charge. After John was then paroled from the New Mexico sentence some years later, the United States Parole Commission ("Commission") revoked John's earlier federal parole and ordered his federal sentence to continue to a 15–year parole reconsideration hearing in December 2008.

John appeals the District Court's denial of a 28 U.S.C. § 2241 habeas petition in which he contended (1) that Commission unconstitutionally denied him a local parole revocation hearing at which he could have confronted adverse witnesses and (2) that Commission set his reparole date improperly. We reverse the District Court's decision, remanding with a direction that John be provided a new parole revocation hearing in accordance with this opinion.

*Background*

In September 1976 John was convicted of sexual assault and sentenced to 30 years' incarceration by the United States District Court for the District of Montana. Commission's June 19, 1994 pre-review report (the "Pre–Review") summarized the behavior underlying that conviction:

> John initially received a 20 year 4205 B2 sentence from the U.S. District Court of Montana on 9–20–76 for rape on a government reservation. The case was aggravated in that the victim was a 22 year old summer employee at the Glacier Nat'l Park on the Blackfeet Indian Reservation in Northwestern Montana. Subject hid in the bushes and as the victim walked past, he grabbed her from behind holding a hunting knife to her throat. In addition, he told her not to cry for help and do exactly what he told her or he would kill her, subject then raped her. Once he completed the sex act he began to strangle the victim and she struggled against him. Subject was not successful in the completion of strangling the victim, however, in the struggle she received a 2–1/2 cut under her chin from the hunting knife as well as bruises on her throat.

Commission paroled John from that 30–year sentence on November 19, 1982.

On May 23, 1986 John entered a guilty plea to a sexual assault charge in a New

---

* The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illi-nois, sitting by designation.

Mexico state court and was sentenced to 12 years' incarceration. That second offense was later summarized in the Pre–Review:

> That offense occurred on or about 4–13–86 and stemmed from the victim and her male companion running out of fuel for their vehicle. Parolee John volunteered to drive one of them to a gas station and the victim went with John on that pretense. She was eventually driven to a secluded area and sexually assaulted. Following that assault, he took her to a second location where she was sexually assaulted once again prior to being returned to her vehicle. It should be noted that subject threatened the victim with death during the assault and choked her while raping her. He also warned her not to tell the police and telling her when he got out of jail he would come back and find her. He told her numerous times that he knew where she lived and he would find her and hurt her if she reported him.

Commission had lodged a detainer against John on May 8, 1986, and on August 2, 1993 John was paroled from his New Mexico sentence into federal custody.

On December 15, 1993 a Commission examining panel conducted John's institutional parole revocation hearing. At that hearing John admitted to the New Mexico conviction but presented evidence of rehabilitation and community resources. Following the hearing, the examining panel rated John's offense behavior as Category 7 severity and determined his salient factor score to be 5, resulting in a reparole guideline range of 78 to 110 months. Because time served on the New Mexico sentence counted as time in custody under the reparole guidelines (28 C.F.R. §§ 2.21(c), 2.47(e) )[1], John's 90 months in custody on the New Mexico conviction made possible an immediate reparole within the guideline range. But the panel suggested a release date of 156 months, finding that John was a more serious risk than his salient factor score indicated in light of both his commission of an additional rape while on parole and the "aggravated behavior" of his assertedly having threatened both victims with death.

Next the federal Regional Commissioner referred John's case to the National Commis-sioners for reconsideration. On February 1, 1994 the National Commissioners issued a Notice of Action that revoked parole and imposed a more severe sanction than the panel had suggested: It ordered John to continue to a 15–year reconsideration hearing in December 2008.

John did not appeal that decision. Instead, in March 1994 he filed a petition for a writ of habeas corpus in the District Court for the District of Arizona, arguing that Commission had wrongfully failed to disclose a police report that detailed the death threats that John had allegedly made during the 1986 rape. Acknowledging that error, Commission issued a Notice of Action that reopened John's case, ordered disclosure of the police report and provided for a new limited revocation hearing:

> This hearing is limited to determining whether you made a threat of death to your rape victim in 1986 and what significance to attach to that threat (if it was made) in light of the 1976 presentence report account of a similar threat to your first rape victim.

On April 7 the District Court dismissed John's habeas petition as moot. Later motions by John to reconsider that dismissal and for a judgment on the pleadings were denied.

On June 28, 1994 John requested that his rehearing take the form of a local revocation hearing near the location of his alleged parole violation. Commission denied that request and held an institutional rehearing at the place of his confinement on October 18, 1994. At that hearing John testified that his intoxication at the time of each rape kept him from recalling the alleged death threats to his 1972 and 1986 victims. John's counsel also presented the testimony of three psychologists who covered John's history of alcoholism and sexual abuse, and who generally "attempted to diminish the seriousness" of any asserted death threats. It was the hearing examiner's conclusion, based on "the file material to include the testimony presented at this time," that John "did in fact threaten to kill the victims involved in the two rapes." That conclusion was reached even though the

---

**1.** Further references to the 28 C.F.R. regulations will simply take the form "Reg. § ___."

only reference to the alleged 1986 threat came from the police report referred to earlier-neither the 1986 victim nor the reporting police officer had testified, so that John (lacking any personal recollection of the event) had no opportunity to challenge the assertion by cross-examination or in any other way. And the hearing examiner suggested that the National Commissioners' Notice of Action for a 15–year reconsideration hearing be re-opened, suggesting instead a later reparole date at the end of 194 months–84 months above the guideline range.

Next a majority panel of the Regional Commission disagreed with the hearing examiner's recommendation, staying with Commission's previous decision to continue John for a 15–year reconsideration hearing in 2008. On November 7, 1994 Commission issued a Notice of Action ordering "[n]o change" in that earlier order. After John took an appeal to the National Appeals Board, that body affirmed Commission's decision in a February 24, 1995 Notice of Action on Appeal.

On August 3, 1995 John filed the habeas petition now at issue, urging (1) that Commission's denial of a local parole revocation hearing at which John could confront and cross-examine adverse witnesses violated John's Fifth Amendment right to due process, (2) that Commission departed upward from the reparole guidelines without the "good cause" required under 18 U.S.C. § 4206(c) and (3) that Commission failed to state its reasons for an upward departure under the reparole guidelines "with particularity," also as required by 18 U.S.C. § 4206(c). John's petition was denied by the District Court on June 30, 1996. John appeals that denial.

### Due Process Right To Confront Adverse Witnesses

■ John contends that his constitutional right to due process required that he be provided with a local revocation hearing, at which he would have been entitled to call the victim of the 1986 rape. Such a local hearing, John argues, would have allowed him to "confront this witness, test her veracity and challenge the evidence" so that Commission "could have substantiated the existence of the threats, if they occurred."

Pursuant to Commission regulations, John was provided no opportunity to confront adverse witnesses-"persons who have given statements upon which revocation may be based" (Reg. § 2.50(c))-at his parole revocation hearing. Two provisions establish that scheme. First, Reg. § 2.49(a) and (c) provide that a parolee retaken following conviction of a new crime is entitled only to an *institutional* revocation hearing upon return to a federal prison, rather than a local hearing "near the place of the alleged violation(s) or arrest." Second, Reg. § 2.50(c) provides that "[a]dverse witnesses will not be requested to appear at institutional revocation hearings." In contrast, parolees entitled to a local revocation hearing may request and confront adverse witnesses (*id.*).

Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) defined the scope of parolees' rights to due process[2] in parole revocation hearings. Because "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others" (*id.* at 482, 92 S.Ct. at 2601), the Court determined that "[i]ts termination calls for some orderly process, however informal" (*id.*). In that respect *Morrissey* identified "two important stages in the typical process of parole revocation" (*id.* at 485, 92 S.Ct. at 2602):

1. Initially, a "preliminary hearing" must be "conducted at or reasonably near the place of the alleged parole violation" so as "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions" (*id.*).

2. If probable cause is found at that first hearing, a "revocation hearing" is required that "must lead to a final evaluation

2. Although *Morrissey*, 408 U.S. at 472, 92 S.Ct. at 2595 established the rights of state parolees under the Due Process Clause of the Fourteenth Amendment, that decision has of course been extended to define the rights of federal parolees seeking due process protections under the Fifth Amendment (see, e.g., *White v. White*, 925 F.2d 287, 290–92 (9th Cir.1991)).

of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation" (*id.* at 488, 92 S.Ct. at 2603).

■ Because John had earlier been convicted of the New Mexico offense, Commission certainly had probable cause to believe that John had violated a condition of his federal parole. That being the case, Commission was not constitutionally bound to provide John with the first of those *Morrissey* hearings (*Moody v. Daggett*, 429 U.S. 78, 86 n. 7, 97 S.Ct. 274, 278 n. 7, 50 L.Ed.2d 236 (1976)). But the New Mexico conviction did not render unnecessary the need for Commission to conduct the second *Morrissey* hearing-the "revocation hearing"-on the issue of "whether continued release is justified notwithstanding the violation" (*id.* at 89, 97 S.Ct. at 280). Despite John's later conviction, parole revocation was not automatic. For example, given the fact that the reparole guidelines made an immediate reparole possible in light of the time that John had already spent in custody on the New Mexico conviction, Commission could well have determined that no purpose was to be served by revoking parole to begin with. Or relatedly, the Supreme Court in *Moody*, 429 U.S. at 89, 97 S.Ct. at 279 did not exclude the possibility that even a parolee convicted of a double homicide might nonetheless receive a nonrevocation decision at the second *Morrissey* hearing.

■ We have earlier made precisely that point in *Heinz v. McNutt*, 582 F.2d 1190, 1193 (9th Cir.1978):

> The import is plain that the *Moody* Court did not consider a conviction and attendant incarceration as obviating the need for a specific determination as to revocation of parole. In other words, the existence of a

violation does not automatically trigger parole revocation.

Rather, John was entitled to identify "circumstances in mitigation" (*Morrissey*, 408 U.S. at 488, 92 S.Ct. at 2603) of his violation so that he might demonstrate to Commission that parole revocation was an inappropriate disposition of his case (*id.*; accord, *Black v. Romano*, 471 U.S. 606, 612, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985)). Indeed, the complexities to be resolved once Commission has confirmed a parole violation were emphasized in *Morrissey*, 408 U.S. at 479–80, 92 S.Ct. at 2599–600 itself:

> Only if it is determined that the parolee did violate the conditions does the second condition arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary.

Not only was John constitutionally entitled to a revocation hearing, but Commission was further compelled by *Morrissey* to abide by the six requirements of accurate factfinding set out there as necessary to satisfy the "minimum requirements of due process" (408 U.S. at 489, 92 S.Ct. at 2604). And therein lies the present dispute. Among those guaranties is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)" (*id.*).[3] Yet we

---

**3.** *Morrissey, id.* describes the other minimal requirements of due process as "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence ...; (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole." None of those procedures is at issue here.

have already said that Reg. § 2.50(c) uniformly denies, to any parolee who has been convicted of a later crime, the right to the appearance of any adverse witnesses. Thus John was denied the right to confront his 1986 rape victim without any specific finding by Commission of good cause for that denial.

■ By the terms of Reg. § 2.50(c) itself, then, the required Pavlovian application of that regulation too strictly limits the right of newly-convicted parolees to confront adverse witnesses. There is, though, an additional wrinkle posed by the unique procedural stance of John's case. Based on Commission's February 24, 1995 Notice of Action on Appeal, it argues here that "[t]he purpose of the [special reconsideration hearing] was not to determine whether or not petitioner's parole should be revoked and whether he should be recommitted to prison-that decision had already been made based upon his conviction-, but rather only for the purpose of establishing an appropriate reparole date." That argument found favor with the District Court, whose opinion stated that "[t]he special reconsideration hearing was held to establish an appropriate reparole date, not to revoke his parole" and that "the original decision to revoke petitioner's parole was based on petitioner's new (1986) conviction."

We find that distinction unpersuasive. It is flawed both in terms of the record and, more importantly, in terms of the Constitution as explicated in *Morrissey*.

On the first of those matters, it is significant that neither Commission's March 31, 1994 Notice of Action granting the special rehearing nor its November 7, 1994 "no change" Notice provided any indication that Commission regarded the details of the 1986 rape as relevant only to John's eventual reparole date. As for the November 7 Notice of Action, it is so brief that it did not even refer to the 1986 rape. And as for the March 31 Notice-which the District Court had found sufficient to render John's first habeas petition moot-it indicated the purpose of that special rehearing in only the most general terms (emphasis added):

> This hearing is limited to determining whether you made a threat of death to your rape victim in 1986 and *what significance to attach to that threat* (if it was

made) in light of the 1976 presentence report account of a similar threat to your first rape victim.

In light of its broad representations to John, reconfirmed in its submission to the District Court as a basis for rejecting John's first habeas petition, Commission cannot convincingly urge that the rehearing had a materially more limited purpose.

■ But even if Commission's backward-looking justification were to be accepted at face value, John had a right under *Morrissey* to confront his adverse witness or witnesses. For as taught by decisions such as *Moody*, 429 U.S. at 89, 97 S.Ct. at 279 and *Heinz*, 582 F.2d at 1193, the existence of the 1986 conviction did not automatically trigger parole revocation. Even apart from the possibility of a guideline-consistent decision not to revoke as referred to earlier, Reg. § 2.52(a) identifies several non-revocation options, including restored parole (with modified conditions, if necessary). In exercising its discretion, Commission was necessarily required to make "a prediction as to the ability of the individual to live in society without committing antisocial acts" (*Morrissey*, 408 U.S. at 480, 92 S.Ct. at 2599). And as must be drawn from *Morrissey, id.* (emphasis added), that revocation decision was bound up in a factual inquiry as to the 1986 rape:

> This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately *how many and how serious the violations were.*

Indeed, the March 31, 1994 Notice of Action says specifically that John's rehearing was for the purpose of determining "whether you made a threat of death to your rape victim in 1986 and what significance to attach to that threat (if it was made)." That Notice, along with John's insistence that he did not recall the threats, placed into issue factual questions as to both the nature and severity of John's parole violation. Under those circumstances, *Morrissey* compels the right to confront any adverse witnesses. As we have held in *White*, 925 F.2d at 291:

> Where the facts are contested, the presence of adverse witnesses, absent good

cause for their nonappearance, is necessary to enable the parole board to make accurate findings.

Ultimately it appears that the drafters of Reg. § 2.50(c) overlooked the clear teaching of cases such as *Morrissey,* 408 U.S. at 479–80, 92 S.Ct. at 2599–600 *Moody,* 429 U.S. at 89, 97 S.Ct. at 279 and *Heinz,* 582 F.2d at 1193 that a determination of parole violation is only the first question to be resolved by Commission at a revocation·hearing. John was entitled to identify "circumstances in mitigation" (*Morrissey,* 408 U.S. at 488, 92 S.Ct. at 2603) of his violation-and to adduce those facts in urging Commission not to revoke his parole. *Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604 further dictates that-absent a specific finding of good cause for not permitting it-John had the right to confront and cross-examine adverse witnesses in the process of making that appeal to Commission. In sum, Reg. § 2.50(c)'s blanket prohibition of the right to call adverse witnesses at John's institutional revocation hearing, without any specific determination of good cause having been made as the basis for denying that right, violated John's Fifth Amendment· right to due process.

### Appropriate Relief

■ In light of Commission's earlier failure to give John an opportunity to cross-examine or to confront adverse witnesses as to the underlying facts relevant to any parole revocation decision, a new parole revocation hearing is plainly in order. That does not necessarily mean, however, that John is entitled to the breadth of relief that he seeks.

Initially, the relief to which John is constitutionally entitled does not necessarily include a *local* revocation hearing. Although *Morrissey,* 408 U.S. at 485, 92 S.Ct. at 2602 required that the first stage-the preliminary "probable cause" hearing-must be held "at or reasonably near the place of the alleged parole violation or arrest," no similar rule was set out for a parolee's revocation hearing.

Indeed, *Morrissey's* first-stage requirement of a local hearing was actually predicated on a different possibility: "it may be that the parolee is arrested at a place distant from the state institution, to which he may be returned before the final decision is made concerning revocation" (*id.*). In that light, other courts have upheld the constitutionality of the Reg. § 2.49(a) and (c) provision that a subsequently convicted parolee's revocation hearing be held at the federal institution (*Villarreal v. United States Parole Comm'n,* 985 F.2d 835, 839 (5th Cir.1993); *Coronado v. United States Bd. of Parole,* 551 F.2d 275, 277 (10th Cir.1977)(per curiam)). Thus an institutional revocation hearing-though of proper scope-is all that the Constitution commands.

■ In that same respect, John's right to confront adverse witnesses at what could be an institutional revocation hearing does not necessarily include a right to the physical presence of his 1986 rape victim. When it set out the minimum procedural requirements to be accorded to an individual facing parole revocation, *Morrissey,* 408 U.S. at 490, 92 S.Ct.at 2604 emphasized that it did not wish to create "an inflexible structure for parole revocation procedures." Rather, *Morrissey, id.* at 489, 92 S.Ct. at 2604 said that the process due at revocation hearings should be "flexible" and that "there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense." Following that lead, we have earlier found that the *Morrissey* right to confrontation is one that must be contoured to "the specific circumstances presented" (*United States v. Martin,* 984 F.2d 308, 311 (9th Cir.1993)) and that the process due a parolee facing parole revocation is derived from "a process of balancing the [parolee's] right to confrontation against the Government's good cause for denying it" (*United States v. Simmons,* 812 F.2d 561, 564 (9th Cir.1987)).[4]

In that regard, *Gagnon,* 411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5 has discussed the

---

4. Although *Simmons* actually spoke in terms of a probationer's right to confrontation at a revocation hearing, its application to the *Morrissey* guaranties in the context of a parole revocation is appropriate. For when defining the process due a probationer facing revocation, *Gagnon v. Scarpelli,* 411 U.S. 778, 782 & n. 3, 93 S.Ct.

1756, 1759 & n. 3, 36 L.Ed.2d 656 (1973) incorporated the *Morrissey* guaranties, noting that "the commentators have agreed that revocation of probation where sentence has been imposed previously is constitutionally indistinguishable from the revocation of parole."

mechanics of implementing a parolee's right to confrontation at a revocation hearing absent live witness testimony:

> An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. Petitioner's greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements.

Whether a substitute to live testimony is in order in this case must be determined according to the strictures of our decisions such as *Martin*, 984 F.2d at 310–14 and *Simmons*, 812 F.2d at 564. And as suggested in *Gagnon*, 411 U.S. at 783 n. 5, 93 S.Ct. at 1760 n. 5 that balancing of appropriate factors is to be left to Commission in the first instance. But whatever path it chooses, Commission must provide John with process minimally sufficient to assure that Commission's "exercise of discretion will be informed by an accurate knowledge of [John's] behavior" (*Morrissey*, 408 U.S. at 484, 92 S.Ct. at 2601). And that discretion is to be exercised in recognition of the critical part that the actual presence or absence of John's alleged threats to his second victim must play in Commission's evaluation of its decisions as to revocation and, if ordered, as to John's prospective reparole date.

### Conclusion

Because a new revocation hearing will surely bring with it either restored parole or a new reparole determination (Reg. § 2.52(a) and (b)), we need not address whether Commission's upward departure from the reparole guidelines was without "good cause" or that Commission's reasoning was not stated "with particularity," both as required by 18 U.S.C. § 4206(c). Those issues will not nec-

essarily arise in the future—or if they do, they will be posed in a wholly different context.

We REVERSE the District Court's decision. We REMAND with the direction that John be provided with a new parole revocation hearing in accordance with this opinion.