**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAMOUS D. NETTLES,
*Petitioner-Appellant*,

v.

RANDY GROUNDS, Warden,
*Respondent-Appellee.*

No. 12-16935

D.C. No.
1:11-cv-01201-AWI-JLT

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted En Banc March 22, 2016
San Francisco, California

Filed July 26, 2016

Before: Sidney R. Thomas, Chief Judge and William A.
Fletcher, Marsha S. Berzon, Johnnie B. Rawlinson, Richard
R. Clifton, Consuelo M. Callahan, Sandra S. Ikuta,
N. Randy Smith, Mary H. Murguia, Jacqueline H. Nguyen
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence by Judge Hurwitz;
Dissent by Judge Berzon

## SUMMARY[*]

### Habeas Corpus / Prisoner Civil Rights

The en banc court vacated the district court's dismissal of a matter, brought as a habeas corpus petition by a California state prisoner serving a life sentence, challenging a disciplinary violation on constitutional grounds and claiming that the failure to expunge this violation from his record could affect his eligibility for parole.

The en banc court held that a 42 U.S.C. § 1983 action is the exclusive vehicle for claims brought by state prisoners that are not within "the core of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973). In so holding, the en banc court overruled *Docken v. Chase*, 393 F.3d 1024 (9th Cir. 2004), and *Bostic v. Carlson*, 884 F.2d 1267 (9th Cir. 1989), to the extent they are inconsistent with this rule.

The en banc court held that the prisoner's claim does not fall within "the core of habeas corpus" because success on the claim would not necessarily lead to immediate or speedier release since the expungement of the challenged disciplinary violation would not necessarily lead to a grant of parole.

The en banc court joined sister circuits in holding that a district court may construe a petition for habeas corpus to plead a cause of action under § 1983 after notifying and obtaining informed consent from the prisoner.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel remanded for further proceedings.

Concurring in part, Judge Hurwitz joined Parts I, II(A), III, and IV of Judge Ikuta's opinion. He wrote that *Skinner v. Switzer*, 562 U.S. 521 (2011), is an unambiguous indication of the Supreme Court's view on the issue in this case, and that parsing the language or history of 28 U.S.C. § 2254 is unnecessary.

Judge Berzon dissented. She wrote that the majority's response – that if the prisoner were successful on his claim, it "would not necessarily lead to his immediate or earlier release from confinement," because the parole board could deny him parole even without considering the disciplinary proceeding at issue – flouts this court's normal approach to alleged violations of procedural rights and is inconsistent with the statutes and precedents governing petitions for habeas corpus.

**COUNSEL**

John P. Balazs (argued), Sacramento, California; Monica Knox, Assistant Federal Defender; Heather Williams, Federal Defender; Office of the Federal Defender, Sacramento, California; for Petitioner-Appellant.

Phillip J. Lindsay (argued), Supervising Deputy Attorney General; Jennifer A. Neill, Senior Assistant Attorney General; Kamala D. Harris, Attorney General of California; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

**OPINION**

IKUTA, Circuit Judge:

Damous Nettles, a prisoner serving a life sentence in California prison, appeals the district court's dismissal of his habeas petition for lack of jurisdiction. The petition challenged a disciplinary violation on constitutional grounds and claimed that the failure to expunge this violation from his record could affect his eligibility for parole. We conclude that because Nettles's claim does not fall within the "core of habeas corpus," *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973), it must be brought, if at all, under 42 U.S.C. § 1983.

I

In 1990, Nettles was convicted in California of attempted first degree murder with the use of a firearm and other offenses. The victim was a woman who had filed a complaint against Nettles's brother. In order to prevent her from testifying, Nettles took the victim down an alley, ordered her onto her hands and knees, and told her "You're not going to testify against my brother. I'm going to kill you." Nettles then shot her twice in the left ear and left her in the alley. The victim did not die, but was seriously injured and disfigured.

Nettles was convicted for attempted murder and dissuading and conspiring to dissuade a witness from attending or giving testimony at trial. He was sentenced to prison for a determinate term of twelve years and a life term with the possibility of parole.

Under California law, prisoners with life terms like Nettles may not be released before their minimum eligible parole date (MEPD). Cal. Penal Code § 3041(a)(4). One year before a prisoner's MEPD, a panel of the Board of Parole Hearings will meet with the prisoner and determine if the prisoner is suitable for parole. *Id.* § 3041(a)(2). "[A] life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2281(a). In determining the prisoner's suitability for parole, the panel must consider "all relevant" information, *id.* § 2281(b), including disciplinary actions received during imprisonment. If the prisoner is suitable for parole and has reached the MEPD, the prisoner is entitled to release. Cal. Penal Code § 3041(a).[1] If the panel determines that the prisoner is unsuitable for parole, the Board of Parole Hearings will schedule a future hearing that could take place from three to fifteen years after the previous hearing, as directed by statutory criteria. *Id.* § 3041.5(b)(3). Once every three years, an inmate may request the board to exercise its discretion to accelerate the next hearing. *Id.* § 3041.5(d).

An initial parole consideration hearing for Nettles was held in 2004 after the presiding parole commissioner determined that Nettles' MEPD was October 19, 2005. Before that hearing, prison staff had issued some thirty-nine rules violations reports to Nettles. These reports are issued for misconduct that "is believed to be a violation of law or is

---

[1] Before state law changed on January 1, 2016, a prisoner's post-conviction credits were a factor in determining the date the prisoner was entitled to release. Cal. Penal Code § 3041(a) (2015). This is no longer the case.

not minor in nature." Cal. Code Regs. tit. 15, § 3312(a)(3). Nettles also received numerous citations for lesser types of misconduct. *See id.* § 3312(a)(2). At Nettles's initial parole hearing in 2004, the Board of Prison Terms (now the Board of Parole Hearings, or Board)[2] deemed Nettles to be unsuitable for parole. It scheduled the next parole suitability hearing for 2006, but the date was postponed several times.

After 2004, Nettles received seven additional rules violations reports. On February 26, 2008, staff issued Nettles a rules violation report for threatening to stab a corrections officer. After an investigation of the incident and a hearing, Nettles was found guilty and given a four-month term in the segregated housing unit. He also lost thirty days of post-conviction credit.

On July 30, 2009, the Board convened a second parole suitability hearing for Nettles. At the hearing, the presiding commissioner first described the facts of Nettles's crime of conviction, characterizing it as "one of the most atrocious and cruel acts I've read" and stating that Nettles's motive was "ridiculously heinous." The commissioner then reviewed Nettles's prior criminal history. Nettles had a long string of convictions beginning at age seventeen and had been in and out of prison for offenses including possession of drugs, assault with a deadly weapon, battery on a peace officer, and robbery. Nettles was on parole for the robbery conviction when he committed the attempted murder for which he was sentenced to life imprisonment. The commissioner stated that

---

[2] At the time of the hearing, the Board was referred to as the Board of Prison Terms. This entity was replaced by the Board of Parole Hearings in 2005. *See* Cal. Gov't Code § 12838.4.

Nettles's lengthy criminal history illustrated his inability to learn from prior incarcerations.

The commissioner next explained the hearing panel's concerns about Nettles's mental state and attitude about the crime. In the hearing panel's view, Nettles's letter to the victim did not express true remorse. Further, Nettles had not taken responsibility for his conduct and lacked insight that would enable him to change his behavior. The commissioner discussed a May 2007 psychological report, which gave Nettles "a rating of overall moderate likelihood to become involved in a violent offense if released." Finally, the commissioner stated that Nettles was argumentative and stubborn, "challenge[d] authority at every given opportunity," and refused to restrain himself, as evidenced by his numerous rules violations. The commissioner noted the forty-six rules violation reports that had been issued to Nettles while he was in prison. Nettles "continued to display negative behavior while incarcerated," and as a result was placed in segregated housing. Moreover, Nettles had not taken any significant steps to gain skills to function outside of prison. Nevertheless, a deputy commissioner noted some positive steps Nettles had taken, including a slight reduction in the number of rules violations reports issued to Nettles in recent years.

The panel of the Board of Parole Hearings concluded that Nettles was unsuitable for parole because he "still pose[d] an unreasonable risk of danger if released from prison." This finding was "based on weighing the considerations provided in the California Code of Regulations." As authorized by the regulations, the commissioner made recommendations regarding "what steps may be undertaken to enhance the possibility of a grant of parole at a future hearing," Cal. Code

Regs. tit. 15, § 2304, telling Nettles that "[f]or next time, you certainly need to become and remain disciplinary free."

On January 23, 2009, Nettles filed a habeas petition in the state trial court claiming, in relevant part, that the 2008 rules violation report was illegal and that the disciplinary proceedings held in connection with the 2008 rules violation report violated his due process rights. The court denied the petition, concluding that Nettles failed to exhaust his administrative remedies concerning these claims.[3] The California Court of Appeal and California Supreme Court then summarily denied the petition.

On June 10, 2011, Nettles filed a habeas petition in federal court seeking expungement of the February 26, 2008 rules violation report and "restoration of good time," presumably referring to the loss of thirty days of post-conviction credits as a result of the 2008 disciplinary decision. After being ordered to respond, the state moved to dismiss the petition, arguing that the court lacked jurisdiction to entertain the petition because the 2008 disciplinary decision did not impact the fact or duration of Nettles's confinement and so was not cognizable in habeas. Nettles opposed the motion, arguing that the disciplinary decision impacted the duration of his confinement because it delayed his parole hearing and constituted grounds for future denial of parole.

The district court dismissed Nettles's petition, holding that he could not show that expungement of the 2008 rules

---

[3] As the state acknowledges, it did not argue to the district court that Nettles's claim was procedurally barred. Nor does the state raise this issue on appeal. Therefore, we do not address it.

violation report was likely to accelerate his eligibility for parole. Nettles timely appealed the district court's decision.

We review de novo a district court's decision to deny a petition for habeas corpus. *Bailey v. Hill*, 599 F.3d 976, 978 (9th Cir. 2010). We also review de novo a district court's determination that it does not have jurisdiction over a habeas corpus petition. *Id.*

II

The Supreme Court has recognized that "[f]ederal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1871 . . . 42 U.S.C. § 1983." *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam). "Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus; requests for relief turning on circumstances of confinement may be presented in a § 1983 action." *Id.* (internal citation omitted). The Court has long held that habeas is the exclusive vehicle for claims brought by state prisoners that fall within the core of habeas, and such claims may not be brought in a § 1983 action. *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) (characterizing the Court's precedents as holding "that a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration"). Based on our review of the development of the Court's case law in this area, we now adopt the correlative rule that a

§ 1983 action is the exclusive vehicle for claims brought by state prisoners that are not within the core of habeas corpus.

A

The Supreme Court first addressed the scope of § 1983 vis-a-vis the scope of habeas in the leading case of *Preiser v. Rodriguez*, 411 U.S. 475 (1973). In *Preiser*, state prisoners who had lost good-time credits as a result of disciplinary proceedings brought an action under § 1983 for restoration of the credits on the ground that the proceedings violated their due process rights. *Id.* at 476–77. The prisoners would have been entitled to immediate release from prison if their good-time credits had been restored, and the Court therefore concluded that habeas was the exclusive remedy for these claims. *Id.* at 500. Although "the literal terms of § 1983 might seem to cover" claims that a prisoner's confinement violated the Constitution, *id*. at 489, the language of the habeas statute is more specific, and the writ's history makes clear that it traditionally "has been accepted as the specific instrument to obtain release from [unlawful] confinement," *id.* at 486. Further, "habeas corpus actions require a petitioner fully to exhaust state remedies, which § 1983 does not." *Wilkinson*, 544 U.S. at 79 (citing *Preiser*, 411 U.S. at 490–91). Based on "[t]hese considerations of linguistic specificity, history, and comity," the Court concluded that Congress intended to make "an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus.'" *Id.* (quoting *Preiser*, 411 U.S. at 487). The claims at issue in *Preiser*, which would have resulted in immediate release if successful, fell within the core of habeas corpus and therefore had to be brought, if at all, in habeas. *See id.*

In a series of cases after *Preiser*, the Supreme Court distinguished between different sorts of state prisoner claims, indicating which claims were in the "core of habeas corpus," *Preiser*, 411 U.S. at 489, and thus could be brought only in a habeas petition, and which claims fell outside that core and could be brought in a § 1983 action. In *Wolff v. McDonnell*, the Court considered a § 1983 class action brought by state prisoners challenging prison rules, practices, and procedures and seeking restoration of good-time credits, injunctive relief, and damages. 418 U.S. 539, 542–44 (1974). The Court held that the plaintiffs' claims for restoration of good-time credits were in the core of habeas and therefore outside the scope of § 1983. *Id.* at 554. By contrast, claims challenging a prison's "*procedures* for depriving prisoners of good-time credits" and seeking damages or a prospective injunction—claims which would not necessarily lead to an earlier release—could be brought in a § 1983 action. *Id.* at 554 (emphasis added).

In *Heck v. Humphrey*, a state prisoner brought a § 1983 action for compensatory and punitive money damages against state officials who had allegedly engaged in unconstitutional procedures in their investigation and handling of evidence. 512 U.S. 477, 478–79 (1994). Analogizing the prisoner's § 1983 action to the common-law cause of action for malicious prosecution, *id.* at 484, the Court held that a plaintiff could not bring a § 1983 action "that necessarily require[d] the plaintiff to prove the unlawfulness of his conviction or confinement," *id.* at 486. To bring such an action, the plaintiff would first have to prove that the conviction or sentence was eliminated, including "by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87. By contrast, an action that, "even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment" falls within § 1983's scope. *Id.* at 487. This

favorable termination rule polices "the intersection of the two most fertile sources of federal-court prisoner litigation—[§ 1983], and the federal habeas corpus statute," *id.* at 480, by ensuring that a court cannot address a § 1983 claim if doing so would require it to first resolve a claim that falls within the core of habeas corpus.

In *Edwards v. Balisok*, the Court held that a state prisoner's challenge under § 1983 that "would necessarily imply the invalidity of the disciplinary hearing and the resulting [deprivation of good-time credits]" fell within habeas's exclusive domain and was barred by the rule in *Heck*, while a claim seeking an injunction barring future unconstitutional procedures was within the scope of § 1983 action. 520 U.S. 641, 644, 648 (1997). The court later clarified, in *Muhammad v. Close*, that such challenges to disciplinary proceedings are barred by *Heck* only if the § 1983 action would be "seeking a judgment at odds with [the prisoner's] conviction or with the State's calculation of time to be served." 540 U.S. at 754–55. If the invalidity of the disciplinary proceedings, and therefore the restoration of good-time credits, would not necessarily affect the length of time to be served, then the claim falls outside the core of habeas and may be brought in § 1983. *See id.*[4]

---

[4] According to the dissent, *Balisok* held that *Heck* bars a prisoner from bringing a § 1983 claim to challenge the procedures used in a disciplinary hearing, even if the claim would not necessarily affect the prisoner's sentence. Dissent at 35–36. But *Muhammad* rejected this "mistaken view" that *Heck* applies to "all suits challenging prison disciplinary proceedings," and clarified that *Heck* applies only to administrative determinations that "necessarily" have an effect on "the duration of time to be served." 540 U.S. at 754–55; *see also Wilkerson v. Wheeler*, 772 F.3d 834, 840 (9th Cir. 2014) (holding that after *Balisok*, *Muhammad* clarified that *Heck* does not bar a § 1983 claim that "threatens no

In this series of cases, the Court made clear that habeas is the exclusive vehicle for claims brought by state prisoners that fall within the core of habeas and that such claims may not be brought under § 1983, but the Court did not have occasion to address the question whether § 1983 was the exclusive vehicle for claims outside the core of habeas. In subsequent cases, the Court began suggesting that § 1983 was the sole remedy for such claims. *See, e.g.*, *Muhammad*, 540 U.S. at 754–55. In *Muhammad*, the Supreme Court limited the applicability of *Heck* by holding that a state prisoner was entitled to challenge administrative determinations that did not "raise any implication about the validity of the underlying conviction" or "necessarily" affect "the duration of time to be served" under § 1983 because such a challenge "raised no claim on which habeas relief could have been granted on any recognized theory." *Id.* In other words, *Muhammad* suggested, without holding, that the scope of habeas is limited to claims in the core of habeas and does not extend to a claim that does not necessarily challenge the validity or duration of the underlying conviction or sentence.

This suggestion that § 1983 and habeas are mutually exclusive vehicles for prisoner claims appeared again in *Wilkinson v. Dotson*, 544 U.S. at 82. In *Dotson*, state prisoners brought a § 1983 action to challenge the state's practice of applying new parole procedures retroactively. *Id.* at 76–77. Like earlier cases that had distinguished between state prisoner claims that were in the "core of habeas," and thus could be brought only in a habeas petition, and those which could be brought in a § 1983 action, *Dotson* concluded

consequence for [an inmate's] conviction or the duration of [his or her sentence]").

that habeas was the exclusive vehicle for state prisoner claims where "success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 82. But a § 1983 action would lie where success on a claim means only that a prisoner will be eligible for parole review, "which at most will speed *consideration* of a new parole application." *Id*. In rejecting the dissent's argument that habeas was available for challenges to parole procedures and therefore provided the exclusive vehicle for them, the Court suggested that habeas was available only for claims that seek "invalidation (in whole or in part) of the judgment authorizing the prisoner's confinement." *Id.* at 83. The concurring opinion in *Dotson* picked up this suggestion that habeas was available only for claims in the core of habeas, stating that it "would utterly sever the writ from its common-law roots" to hold that "the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." *Id.* at 86 (Scalia, J., concurring).

*Dotson*'s suggestion that a § 1983 action is the exclusive vehicle for state prisoner claims that are not within the core of habeas was echoed more strongly in the Supreme Court's most recent pronouncement on this issue, *Skinner v. Switzer*. 562 U.S. 521 (2011). There, a state prisoner moved in state court for DNA testing of certain crime scene evidence. *Id.* at 527–29. After the state court denied the motions, the prisoner brought a federal action for injunctive relief under § 1983, alleging a due process violation. *Id.* at 529. The district court dismissed the action on the ground that "postconviction requests for DNA evidence are cognizable only in habeas corpus, not under § 1983." *Id.* The Court disagreed and indicated that the correct analysis was the exact opposite:

because an action for DNA testing was not within the core of habeas, it could be brought only in § 1983. *Id.* at 533–34, 535 n.13. In reaching this conclusion, the Court relied first on the *Dotson* concurrence and its indication that habeas was available only for claims in the core of habeas corpus. "It suffices to point out that [the state] has found no case, nor has the dissent, in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'" *Id.* at 534 (quoting *Dotson*, 544 U.S. at 86 (Scalia, J., concurring)). Second, rejecting the state's argument that a claim for DNA testing lay "at the core" of a criminal proceeding and had to be brought in habeas, the Court instead characterized its prior decision in *Dotson* as declaring "in no uncertain terms, that when a prisoner's claim would not necessarily spell speedier release, that claim does not lie at "the core of habeas corpus," and may be brought, if at all, under § 1983." *Id.* at 535 n.13 (internal quotation marks omitted). *Skinner* also alluded to the existence of a firm line between habeas and § 1983, noting that the state's argument "cannot be reconciled with the line our precedent currently draws" between habeas and § 1983, and suggested that the core of habeas defines the contours of that line. *See id.*[5]

---

[5] While "courts originally confined habeas relief to orders requiring the petitioner's unconditional release from custody," we have recognized that "[i]n modern practice" courts may "employ a conditional order of release in appropriate circumstances, which orders the State to release the petitioner unless the State takes some remedial action, such as to retry (or resentence) the petitioner." *Harvest v. Castro*, 531 F.3d 737, 741 (9th Cir. 2008). Contrary to the dissent, *see* Dissent at 37, this modern practice is consistent with the standard for habeas relief noted in *Dotson* and *Skinner*, because "the prisoner who shows his sentencing was unconstitutional is actually entitled to release, because the judgment pursuant to which he is

We read these statements as strongly suggesting that habeas is available only for state prisoner claims that lie at the core of habeas (and is the exclusive remedy for such claims), while § 1983 is the exclusive remedy for state prisoner claims that do not lie at the core of habeas. Although the Supreme Court has not provided an express ruling on the scope of habeas, "we afford 'considered dicta from the Supreme Court . . . a weight that is greater than ordinary judicial dicta as prophecy of what the court might hold.'" *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1246 (9th Cir. 2013) (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc)); *see also United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996) ("Although the *Daniel* construction . . . may be dictum, we treat Supreme Court dicta with due deference, and see no reason not to apply the Court's construction in the case at bar.").

The dissent heavily relies on cases where prisoners in federal custody brought habeas petitions under 28 U.S.C. § 2241 claiming that the Bureau of Prisons acted contrary to a federal statute that authorized it to shorten the sentence of a federal prisoner under certain circumstances. Dissent at 33–34, 45–47. *See, e.g.*, *Rodriguez v. Copenhaver*, — F.3d —, No. 14-16399, 2016 WL 3003423, at *4 (9th Cir. May 25, 2016); *Close v. Thomas*, 653 F.3d 970, 973–74 (9th Cir. 2011); *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009). None of these cases addressed the scope of habeas relief available to federal prisoners under § 2241, and therefore they shed no light on the issue before us. Nor do the Supreme Court's recent cases addressing the scope of habeas petitions

confined has been invalidated; the conditional writ serves only to 'delay the release . . . in order to provide the State an opportunity to correct the constitutional violation.'" *Dotson*, 544 U.S. at 86 (Scalia, J., concurring).

vis-à-vis § 1983 involve the rights of federal prisoners. *See, e.g.*, *Skinner*, 562 U.S. at 527; *Dotson*, 544 U.S. at 82. Because the case before us involves a state prisoner's action under 28 U.S.C. § 2254, we need not address how the standard suggested in *Skinner* and adopted here applies to relief sought by prisoners in federal custody.[6]

B

Other factors support our adoption of the Supreme Court's strong suggestion that a § 1983 action is the exclusive vehicle for claims that are not within the core of habeas.

First, such a conclusion is consistent with the analytical framework in *Preiser*. In holding that § 1983 did not extend to claims within the core of habeas, *Preiser* put great weight on congressional intent in determining that Congress had amended the habeas statutes to require the "exhaustion of

---

[6] Different rules apply to state and federal prisoners seeking relief. "The general rule is that a motion under 28 U.S.C. § 2255 is the exclusive means by which a federal prisoner may test the legality of his detention, and that restrictions on the availability of a § 2255 motion cannot be avoided through a petition under 28 U.S.C. § 2241." *Stephens v. Herrera*, 464 F.3d 895, 897 (9th Cir. 2006) (internal citation omitted). By its terms, 28 U.S.C. § 2255 applies only to prisoners "claiming the right to be released" upon one of a few enumerated grounds. A federal prisoner may file a § 2241 petition "if, and only if, the remedy under § 2255 is inadequate or ineffective to test the legality of his detention" such as when a prisoner "(1) makes a claim of actual innocence, and (2) has not had an unobstructed procedural shot at presenting that claim." *Marrero v. Ives*, 682 F.3d 1190, 1192 (9th Cir. 2012) (internal quotation marks omitted). As a further distinction, § 1983 is generally unavailable to federal prisoners challenging prison conditions, but such prisoners may have recourse under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and the Federal Tort Claims Act (FTCA).

adequate state remedies as a condition precedent to the invocation of federal judicial relief under those laws" as a way to further Congress's policy goal of avoiding "unnecessary friction between the federal and state court systems." 411 U.S. at 489–91. The Court held that it should respect this congressional intent, *id.* at 492 n.10, and that "[i]t would wholly frustrate explicit congressional intent to hold that the respondents in the present case could evade this requirement by the simple expedient of putting a different label on their pleadings," *id.* at 489–90.

Just as Congress's amendments to the habeas statute indicated an intent to make habeas the exclusive remedy for claims at the core of habeas, *see id.*, Congress's enactment of the Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), indicated an intent to make § 1983 the exclusive remedy for "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA was intended "to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court." *Id.* at 528. Before the PLRA, plaintiffs pursuing actions under § 1983, including "[p]risoner suits alleging constitutional deprivations while incarcerated" did not have to "exhaust administrative remedies before filing suit in court." *Id.* at 523 (citing *Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (per curiam)). But Congress "enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits" by requiring exhaustion of prisoners' § 1983 claims. *Id*. at 524.[7] Congress intended this

---

[7] 42 U.S.C. § 1997e(a), provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

exhaustion requirement to have a broad scope: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532.

Congress's intent that state prisoners satisfy PLRA requirements for all § 1983 suits about prisoner life (other than claims at the core of habeas) suggests that Congress wanted § 1983 to be the exclusive vehicle for such claims. As in *Preiser*, "[i]t would wholly frustrate explicit congressional intent" to hold that prisoners could evade the requirements of the PLRA "by the simple expedient of putting a different label on their pleadings." 411 U.S. at 489–90. Moreover, because Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub L. No. 104-132, 110 Stat. 1214, at the same time as it enacted the PLRA, we infer that Congress did not intend to make § 1983 and habeas regimes interchangeable or overlapping. AEDPA added procedural requirements for prisoners bringing habeas corpus petitions that are separate and distinct from those imposed on § 1983 claims by the PLRA, *see Woodford v. Ngo*, 548 U.S. 81, 97 (2006), indicating an intent to make these regimes independent and mutually exclusive.[8]

---

exhausted."

[8] The procedural requirements imposed by AEDPA and the PLRA are distinct in substantial respects. The PLRA attempts to "filter out nonmeritorious claims," *Jones v. Bock*, 549 U.S. 199, 213 (2007), by requiring judicial screening of prisoner litigation, 28 U.S.C. § 1915(e), and depriving a prisoner of the right to file in forma pauperis if the prisoner incurs three "strikes," defined as dismissals "on the grounds that [the claim] was frivolous, malicious, or fails to state a claim upon which relief

In effect, these Congressional enactments channel prisoner litigation through the set of procedures that is best suited to address the type of prisoner grievance at issue. Many suits about prison conditions can be addressed effectively and speedily by correction officials through internal grievance procedures, which "might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *See, e.g.*, *Porter*, 534 U.S. at 525. And if such claims are not resolved by corrective action at the prison, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.* Thus, a § 1983 action subject to the PLRA exhaustion requirements, which mandate that a prisoner first exhaust the prison's administrative processes to the extent they are available, is the best means of addressing such claims. On the other hand, habeas corpus is the exclusive remedy to attack the legality of the conviction or sentence, and for these sorts of claims the exhaustion requirement gives a state court "an opportunity to correct its own constitutional errors" before a federal court orders release, thus respecting

---

may be granted," *id.* § 1915(g). AEDPA does not have any similar requirements. AEDPA and the PLRA also impose different exhaustion requirements. Under AEDPA, a state prisoner must pursue and exhaust all remedies available in state court before a federal court may entertain a petition, unless corrective process is unavailable in the state or is ineffective in protecting the prisoner's rights. *Id.* § 2254(b)(1). Under the PLRA, by contrast, prisoners must exhaust state *administrative* remedies by filing a grievance within the state prison system unless administrative remedies are not "available," but the plaintiff need not exhaust state judicial remedies before filing in federal court. *Id.* § 1997e(a); *Woodford*, 548 U.S. at 85; *McBride v. Lopez*, 807 F.3d 982, 986 (9th Cir. 2015). Furthermore, AEDPA bars second or successive petitions challenging the same state court judgment, with some narrow exceptions for claims that were not presented in the prior petition, *see* 28 U.S.C. § 2244(b), but the PLRA contains no analogous limitation.

traditional notions of federal-state comity. *Preiser*, 411 U.S. at 484, 490–91. Our holding that a § 1983 action is the exclusive vehicle for suits about prison life furthers Congress's efforts to direct prisoner litigation to the appropriate procedural channel.

C

We are also persuaded to adopt the rule that habeas is available only for actions in the "core of habeas" because it has the benefits of clarity and administrability. Our pre-*Skinner* opinions addressing this issue struggled to draw a line between habeas and § 1983 actions, and we have not provided clear direction to state prisoners bringing such challenges or district courts addressing them. We have long held that prisoners may not challenge mere conditions of confinement in habeas corpus, *see Crawford v. Bell*, 599 F.2d 890, 891–92 (9th Cir. 1979),[9] but we have reached inconsistent results in our efforts to delineate more precisely the claims which may not be brought in habeas. Thus, while we stated in *Ramirez v. Galaza* that a prisoner could not bring a habeas petition to seek expungement of a disciplinary charge where "a successful challenge to a prison condition will not *necessarily* shorten the prisoner's sentence," 334 F.3d 850, 859 (9th Cir. 2003) (emphasis added), we subsequently stated, inconsistently, that prisoners could bring claims in a habeas petition "challenging aspects of their

---

[9] The Fifth, Sixth, Seventh, and Tenth Circuits have reached the same conclusion. *See Luedtke v. Berkebile*, 704 F.3d 465, 465–66 (6th Cir. 2013); *Glaus v. Anderson*, 408 F.3d 382, 386 (7th Cir. 2005); *Carson v. Johnson*, 112 F.3d 818, 820–21 (5th Cir. 1997); *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997). *But see Aamer v. Obama*, 742 F.3d 1023, 1031–32 (D.C. Cir. 2014).

parole review" so long as success on the claims "*could potentially* affect the duration of their confinement," *Docken v. Chase*, 393 F.3d 1024, 1031 (9th Cir. 2004) (emphasis added); *see also Bostic v. Carlson*, 884 F.2d 1267, 1269 (9th Cir. 1989) (holding that a prisoner could bring a petition in habeas to seek relief from various disciplinary decisions that resulted in "forfeiture of statutory good time or segregation from the general prison population," where the relief was for "expungement of the incident from his disciplinary record" so long as such "expungement is *likely* to accelerate the prisoner's eligibility for parole." (emphasis added)).

By contrast, *Skinner*'s core-of-habeas standard is a well-tested one that does not require the sort of probabilistic analysis found in some of our prior precedent, such as whether success on a claim would be "likely" to lead to an earlier release, *Bostic*, 884 F.2d at 1269, or "*could potentially* affect the duration of their confinement," *Docken*, 393 F.3d at 1031 (emphasis added). The standard suggested in *Skinner* does not require us to guess at the discretionary decisions of state officials in order to determine whether an action sounds in habeas or § 1983, and which prerequisites must be met. And it follows *Skinner's* suggestion "that habeas might not even be *available* for 'probabilistic' claims." *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 665 (D.C. Cir. 2013).[10] This rule will likewise give needed clarity to state prisoners. If the prisoner's claim challenges the fact or duration of the conviction or sentence, compliance with AEDPA is

---

[10] The dissent cites to Fifth, Sixth and D.C. Circuit cases holding that "there is some degree of permissible overlap between § 1983 and habeas," Dissent at 43, but each was decided before *Skinner* suggested a different standard. *Davis* is the only out-of-circuit case to date to consider *Skinner*'s suggestion regarding the scope of habeas relief.

mandated, while if the claim challenges any other aspect of prison life, the prisoner must comply with the PLRA.[11]

Accordingly, we now resolve the inconsistency in our case law and adopt the Supreme Court's suggestion that if a state prisoner's claim does not lie at "the core of habeas corpus," *Preiser*, 411 U.S. at 487, it may not be brought in habeas corpus but must be brought, "if at all," under § 1983, *Skinner*, 562 U.S. at 535 n.13. We therefore overrule *Docken v. Chase*, 393 F.3d 1024, and *Bostic v. Carlson*, 884 F.2d 1267, to the extent they are inconsistent with this rule.

III

We now apply this standard to Nettles's federal habeas petition, which challenged the disciplinary proceedings held in connection with the 2008 rules violation report. Nettles argues that his claims affect the duration of his sentence because if he succeeded in expunging his 2008 rules violation report, the Board would more likely set his next parole hearing at an earlier date, Cal. Penal Code § 3041.5(b)(4), and would be more likely to give him a favorable parole ruling.[12]

---

[11] The dissent suggests that this rule deprives petitioners of a remedy for procedural violations. *See* Dissent at 33. To the contrary, our holding channels prisoner claims through the appropriate procedures, rather than foreclosing relief. Thus, if a state prisoner's success in challenging a procedural violation would necessarily result in immediate or speedier release from custody, the prisoner's claim would sound in habeas, while a state prisoner could challenge other procedural violations by bringing an action under § 1983.

[12] Nettles also argued that once granted parole, the panel's calculation of the time he must serve before release will necessarily be affected by the reinstated postconviction credits. But after January 1, 2016, the effective date of the new law, the panel no longer calculates a release date, making

We disagree. Success on the merits of Nettles's claim would not necessarily lead to immediate or speedier release because the expungement of the challenged disciplinary violation would not necessarily lead to a grant of parole. Under California law, the parole board must consider "[a]ll relevant, reliable information" in determining suitability for parole. Cal. Code Regs. tit. 15, § 2281(b). A rules violation is merely one of the factors shedding light on whether a prisoner "constitutes a current threat to public safety," *In re Lawrence*, 190 P.3d 535, 553 (Cal. 2008). Because the parole board has the authority to deny parole "on the basis of any of the grounds presently available to it," *Ramirez*, 334 F.3d at 859, the presence of a disciplinary infraction does not compel the denial of parole, nor does an absence of an infraction compel the grant of parole.

Here, the panel of the Board of Parole Hearings considered a range of relevant factors bearing on Nettles's future dangerousness, including his inability to learn from prior imprisonments, his lack of insight and remorse regarding his crimes, and his argumentative and stubborn attitude. The presiding commissioner discussed at great length the factors that led him to conclude that Nettles was not suitable for parole, including the heinous nature of Nettles's crime of conviction, a psychological report on Nettles, and Nettles's attitude. While the presiding commissioner did note the multiple rules violations reports issued to Nettles, his remarks gave no indication that Nettles's 2008 violation report was an important, let alone determinative, factor in his decision.

---

this argument no longer relevant. *See* Cal. Penal Code § 3041(a).

Under California law and the circumstances of Nettles's case, the panel could deny parole to Nettles even if he succeeded in expunging the 2008 rules violation report. Furthermore, since the decision to grant an earlier release date on the basis of new information is placed in the discretion of the parole board, Cal. Penal Code § 3041.5(d)(1), success on Nettles's claim would not even necessarily lead to an earlier parole hearing.

Because success on Nettles's claims would not necessarily lead to his immediate or earlier release from confinement, Nettles's claim does not fall within "the core of habeas corpus," *Skinner*, 562 U.S. at 535 n.13, and he must instead bring his claim under § 1983.

IV

Although Nettles's claims are not cognizable in habeas, we must still consider whether the district court may construe Nettles's habeas petition as pleading a cause of action under § 1983.

The Supreme Court has long held that habeas petitions "may . . . be read to plead causes of action under [§ 1983]" and that prisoners bringing the wrong action are "entitled to have their actions treated as claims for relief under the Civil Rights Acts." *Wilwording*, 404 U.S. at 251. The Seventh and Eighth Circuits have also concluded that under certain circumstances, a court may convert a habeas petition into a civil rights claim under § 1983 or *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See Spencer v. Haynes*, 774 F.3d 467, 471 (8th Cir. 2014) (stating that habeas petitions can be recharacterized as § 1983 or *Bivens* actions); *Robinson v. Sherrod*, 631 F.3d

839, 841 (7th Cir. 2011) (same); *Glaus v. Anderson*, 408 F.3d 382, 388 (7th Cir. 2005) (stating that such recharacterization is not "utterly out of the question").

The rule in *Wilwording*, however, was developed long before the enactment of the PLRA, during a time when a court could allow a pro se litigant to replead a habeas claim as a § 1983 claim or merely ignore the error in pleading. *Glaus*, 408 F.3d at 388. After the PLRA became effective, "a habeas corpus action and a prisoner civil rights suit differ in a variety of respects—such as the proper defendant, filing fees, the means of collecting them, and restrictions on future filings—that may make recharacterization impossible or, if possible, disadvantageous to the prisoner compared to a dismissal without prejudice of his petition for habeas corpus." *Robinson*, 631 F.3d at 841; *see also Glaus*, 408 F.3d at 388 (noting that recharacterizing a prisoner's action as a civil rights action may make it subject to the PLRA's three-strikes rule and different exhaustion requirements, as well as requiring the complaint to name a different defendant, such as the individual official responsible for the wrong rather than the warden).

In the reverse situation, where a district court recharacterized a pro se litigant's civil rights claim as a habeas petition, the Supreme Court warned courts to avoid a recharacterization that disadvantaged a petitioner by, for example, subjecting the petitioner to restrictions on second or successive habeas petitions. *Castro v. United States*, 540 U.S. 375, 382–83 (2003). Accordingly, *Castro* held that before recharacterizing a civil rights claim, a district court must "notify the *pro se* litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion

will be subject to the restrictions on 'second or successive' motions, and provide the litigant an opportunity to withdraw the motion or to amend it so that it contains all the § 2255 claims he believes he has." *Id.* at 383; *see also United States v. Seesing*, 234 F.3d 456, 464 (9th Cir. 2000) (holding that a court should not recharacterize a prisoner's pro se filing as a federal habeas petition when doing so would be to the prisoner's disadvantage).

We agree with the Seventh Circuit that "the same logic should apply to the potential conversion of a habeas corpus petition into a civil rights claim." *Glaus*, 408 F.3d at 388. "If the complaint is amenable to conversion on its face, meaning that it names the correct defendants and seeks the correct relief, the court may recharacterize the petition so long as it warns the *pro se* litigant of the consequences of the conversion and provides an opportunity for the litigant to withdraw or amend his or her complaint." *Id.*; *see also Robinson*, 631 F.3d at 841 (warning district courts "not to recharacterize a prisoner's petition for habeas corpus as a prisoner civil rights complaint without his informed consent"); *Spencer*, 774 F.3d at 471 ("[T]he better practice will be for district courts to first obtain the consent of the pro se individual before converting their claims from a habeas proceeding to a *Bivens* action.").

Joining our sister circuits, we hold that a district court may construe a petition for habeas corpus to plead a cause of action under § 1983 after notifying and obtaining informed consent from the prisoner. Accordingly, we vacate the district court's dismissal of this matter and remand it to the district court for proceedings consistent with this opinion.

**VACATED AND REMANDED**.

HURWITZ, Circuit Judge, concurring in part:

Until 2011, the Supreme Court had not yet spoken clearly on the issue reserved in *Preiser v. Rodriguez*: the availability of habeas corpus relief "as an alternative remedy to a proper action under § 1983." 411 U.S. 475, 500 (1973). But, things have changed.

In *Wilkinson v. Dotson*, the Court confirmed that a suit under42U.S.C. § 1983 "will not lie when a stateprisoner challenges the fact orduration of his confinement, and seeks either immediate release from prison, or the shortening of his term of confinement." 544 U.S. 74, 79 (2005) (citations and quotation marks omitted). As in *Preiser*, the *Dotson* majority did not address whether 28 U.S.C. § 2254 habeas corpus jurisdiction is confined to such challenges, contenting itself to find that the respondents' claims fell outside the "implicit habeas exception" and were cognizable under § 1983. *Id.* at 82. But, Justice Scalia's concurrence squarely addressed the issue now before us. He contended that allowing suits like the one before us today to proceed under § 2254 "would require us to broaden the scope of habeas relief beyond recognition." *Id.* at 85 (Scalia, J., concurring). Justice Scalia perceived a bright-line test for habeas jurisdiction:

> It is one thing to say that permissible habeas relief, as our cases interpret the statute, includes ordering a quantum change in the level of custody, such as release from incarceration to parole. It is quite another to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release

> from custody, nor reduces the level    of
> custody.

*Id.* at 86 (citation and quotation marks omitted).  Expanding habeas jurisdiction to cover such claims, Justice Scalia warned, "would utterly sever the writ from its common-law roots." *Id.*

Until 2011, Justice Scalia's concurrence (joined by Justice Thomas) was simply the view of two Justices on an undecided issue.  But, then came *Skinner v. Switzer*, 562 U.S. 521 (2011).  That case, like *Preiser* and *Dotson*, involved the scope of § 1983 jurisdiction; the Court concluded that a prisoner claiming a denial of due  process because of the state's refusal to give him access to DNA samples could seek relief under the civil rights statute. *Id.* at 534. But, in explaining that decision, the six-Justice *Skinner* majority expressly rejected the respondent District Attorney's argument (adopted by the three dissenters) that "Skinner's request for DNA testing  must be pursued, if at all, in an application for habeas corpus, not in a § 1983 action." *Id*. Most importantly for today's purposes, the Court did so by citing Justice Scalia's *Dotson* concurrence with approval:

> It suffices to point out that Switzer has found
> no case, nor has the dissent, in which  the
> Court  has recognized habeas  as  the sole
> remedy, *or  even an  available one*, where the
> relief sought would "neither terminat[e]
> custody, accelerat[e] the future date of release
> from custody, nor reduc[e] the level of
> custody." *Dotson*, 544 U.S., at 86, 125 S. Ct.
> 1242 (Scalia, J., concurring).

*Id*. (emphasis added) (brackets in original). The Court later reinforced the point, again citing Justice Scalia's concurrence with approval:

> *Dotson* declared, however, in no uncertain terms, that when a prisoner's claim would not "necessarily spell speedier release," that claim does not lie at "the core of habeas corpus," and may be brought, if at all, under § 1983. 544 U.S., at 82, 125 S. Ct. 1242 (majority opinion) (internal quotation marks omitted); see *id.,* at 85–86, 125 S. Ct. 1242 (Scalia, J., concurring).

*Id*. at 535 n.13.

I find *Skinner* an unambiguous indication of the Supreme Court's view on the issue before us. The statements quoted above are, to be sure, technically dicta—the question before the Court was whether Skinner could bring a § 1983 claim, not a habeas petition. But, in rejecting the District Attorney's contention that Skinner had a potential remedy in habeas alone, the Court expressly adopted the reasoning in Justice Scalia's *Dotson* concurrence that § 2254 relief is limited to claims that would necessarily spell speedier release, accelerate future release from custody, or reduce the level of custody. Nettles does not pose such a claim.

Supreme Court dicta as carefully considered as that in *Skinner* is special; it should be followed absent compelling reasons to the contrary. This case presents none. Were we engaged in an "*Erie* guess" today about how a state supreme court might decide an issue, we would not pause a moment in light of the kind of statements in *Skinner*. We should give

the Supreme Court similar deference in these circumstances; we best perform our duties as an Article III "inferior" court by not treating the carefully considered *Skinner* statements, consciously used to reject an argument that habeas was an available remedy, as idle musings.

Were we approaching this matter on a clean slate, traditional principles of statutory construction might lead me to a different result. But we are not. Parsing the language or history of § 2254 is unnecessary to determine where the Supreme Court stands on the issue before us. I therefore join Parts I, II(A), III, and IV of Judge Ikuta's opinion.

---

BERZON, Circuit Judge, joined by THOMAS, Chief Judge, and FLETCHER, MURGUIA, and NGUYEN, Circuit Judges, dissenting:

Damous Nettles was denied parole. He argues the parole board's decision was based at least in part on a disciplinary proceeding in which he was denied due process. Today's majority opinion responds that if Nettles were successful on his claim, it "would not necessarily lead to his immediate or earlier release from confinement," because the parole board could deny him parole even without considering the disciplinary proceeding at issue. Pr. Op. at 25.[1] The majority therefore holds that Nettles cannot seek a writ of habeas corpus. This response flouts our normal approach to alleged

---

[1] Only some portions of Judge Ikuta's opinion have the support of a majority of the en banc court. So it is the majority opinion in some respects and a plurality opinion in others. For clarity, I cite it in this dissent as the "Principal Opinion" ("Pr. Op.").

violations of procedural rights and is inconsistent with the statutes and precedent governing petitions for habeas corpus. I therefore respectfully dissent.

# I

When the violation of a procedural right is alleged, the constitutional claim cannot be dismissed just by noting that the proceeding in question might have come out the same way absent the alleged violation. "[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . ." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). In other words, the rights Nettles has going into a hearing may be invoked "whatever the ultimate outcome of [the] hearing" may be. *Id.* (quoting *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972)) (internal quotation marks omitted).

This principle exists both to protect individual rights and to maintain the public good stemming from the scrupulous enforcement of impartial procedures. The individual right to a public trial, for instance, has long been "recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U.S. 257, 270 (1948). The right to an opportunity to be heard in administrative hearings helps hold government officials accountable for their assertions. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170–71 (1951). These systemic benefits would not accrue if the Constitution's procedural safeguards were allowed to lapse where we thought it likely they would not affect the outcome of a hearing or trial. *See Carey*, 435 U.S. at 266.

The standard announced by today's majority circumvents this basic facet of procedural justice. The majority opinion holds that habeas petitions are not available unless a claimant's success "would *necessarily* demonstrate the invalidity of confinement or its duration." Pr. Op. at 9–10 (emphasis added) (internal quotations omitted). Where a claimant alleges a procedural violation, as Nettles does here, the majority uses the fact that the proceeding *might* have resulted in the same outcome anyway to close the door to habeas relief entirely.

This approach, if taken seriously, will foreclose habeas relief on many procedural claims. Petitions for a writ of habeas corpus may be brought by those alleging they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also* 28 U.S.C. § 2254(a). We regularly interpret this language to include prisoners who assert their confinement to be predicated on the violation of a procedural right, even if the proceeding in question might have come out the same way had constitutionally proper procedures been followed. *See, e.g.*, *Dixon v. Williams*, 750 F.3d 1027, 1032 (9th Cir. 2014) (right to due process); *United States v. Withers*, 638 F.3d 1055, 1063 (9th Cir. 2011) (right to a public trial); *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (right to confront witnesses); *Bonin v. Calderon*, 59 F.3d 815, 824 (9th Cir. 1995) (right to assistance of counsel); *Campbell v. Blodgett*, 978 F.2d 1502, 1508 (9th Cir. 1992) (right to be present during *voir dire*). The successful invocation of some procedural rights, like the right to effective assistance of counsel, may depend on an affirmative showing that the outcome of the proceeding in question was prejudiced in some way. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 693 (1984). But it will almost always be the case that the

proceeding *could* have resulted in the same outcome even absent the alleged defect.

Just as the prisoners in the cited cases argued that they were in custody in violation of the law due to a trial prejudiced by procedural violations, Nettles argues he is in custody in violation of the law due to a parole hearing prejudiced by procedural violations. We have regularly heard post-conviction claims brought in habeas by prisoners even when the relief sought would not necessarily result in a speedier release.

Earlier this year, for instance, in *Rodriguez v. Copenhaver*, we granted relief to a federal prisoner under § 2241 even though such relief "would not necessarily lead to his immediate or earlier release from confinement." Pr. Op. at 25; *see Rodriguez v. Copenhaver*, __ F.3d __ , No. 14-16399, 2016 WL 3003423 (9th Cir. May 25, 2016). In that case, Rodriguez contested the BOP's rejection of his request to get credit applied to his sentence for time served in state custody. *Id.* at *3. In evaluating Rodriguez's request, the BOP considered a letter from a judge who had been recused from Rodriguez's case. *Id.* at *3–4. We held that by incorporating the letter into its decision, the BOP violated both due process and a federal statute. *Id.* at *4.

Importantly, *Rodriguez* did not indicate that Rodriguez was *entitled* to have credit applied to his sentence. To the contrary, we noted that the BOP's decision was an exercise of discretion. *Id.* at *3; *see also* 18 U.S.C. § 3621(b). As a result, we simply remanded with directions for the Bureau of Prisons (BOP) to reconsider Rodriguez's request anew, without regard to the judge's letter. *Rodriguez*, 2016 WL 3003423, at *4.

*Rodriguez* is not the only habeas petition we have entertained relating to early release where the petitioner's success "*would not necessarily* spell immediate or speedier release." *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005); *see, e.g.*, *Close v. Thomas*, 653 F.3d 970 (9th Cir. 2011); *Crickon v. Thomas*, 579 F.3d 978 (9th Cir. 2009).

The Supreme Court has also heard at least two such cases, *California Department of Corrections v. Morales*, 514 U.S. 499, 504 (1995), and *Edwards v. Balisok*, 520 U.S. 641 (1997). In *Morales*, the petitioner, Morales, brought a habeas action via 28 U.S.C. § 2254 arguing that a statute violated the Constitution's prohibition on *ex post facto* laws. 514 U.S. at 504. The statute in question meant that Morales was eligible for parole suitability hearings every three years rather than each year. *Id.* at 503.

*Edwards v. Balisok*, a case the majority discusses, is another relevant example and hints at the implications of the majority's standard. Pr. Op. at 12. In *Balisok*, the Supreme Court required the respondent, Balisok, to bring his due process challenge to the prison's disciplinary procedures under the habeas statute, rather than § 1983. 520 U.S. at 648. Balisok did not dispute the result of his disciplinary hearing, admitting that the prison likely could revoke his good-time credit in a procedurally proper hearing. *Id.* at 644–45, 647–48. However, because Balisok's procedural challenges "impl[ied] the invalidity of the punishment imposed," he was required to proceed in habeas, even though the validity of his underlying judgment of conviction was not at stake, and even though success on his claim would not necessarily have resulted in speedier release. *Id.* at 648. The majority's standard apparently would leave similarly situated plaintiffs

without a remedy, barring them from seeking relief using the only route the Supreme Court left open.[2]

For Morales, Rodriguez, and Balisok, as well as for many who challenge the adequacy of procedures used at the trial resulting in their conviction, the procedural violation may not have been the *cause* of their confinement. They might well have been confined absent the violation. But the Supreme Court has never held — or even suggested — that petitioners such as these have not successfully alleged they are "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. §§ 2241(c)(3), 2254(a). To the contrary, the cases just discussed suggest that a petitioner meets this statutory language and may seek a writ of habeas corpus if they are (1) in custody, and (2) their custody "could potentially" end or be shortened if an unconstitutional procedure were voided and a new proceeding ordered. *See Docken v. Chase*, 393 F.3d 1024, 1031 (9th Cir. 2004) (emphasis omitted).[3]

---

[2] Each of these examples counters the suggestion by both the majority and Judge Hurwitz's concurrence that there exists "no case . . . in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody." Pr. Op. at 15 (quoting *Skinner v. Switzer*, 562 U.S. 521, 534 (2011)) (internal quotation marks and citation omitted); Concurring Op. at 29–30 (same).

[3] Again, it is possible that habeas relief could be denied in a case such as this one on lack of prejudice grounds, if the prejudice standard appropriate to the circumstances were not met. The present issue, however, is whether the petitioner was entitled to bring a habeas petition at all.

This understanding of the habeas statutes is also more consonant with the relief that courts typically grant a habeas petitioner. A petitioner's success on their habeas claim often does not meet the majority's standard of "immediate or speedier release." Pr. Op. at 24. Frequently, federal courts allow the prisoner to remain confined while the relevant proceeding is redone. *See, e.g.*, *Rodriguez*, 2016 WL 3003423, at \*4. These remedies are consistent with Congress's directive that courts sitting in habeas "shall . . . dispose of the matter as law and justice require." 28 U.S.C. § 2243. Consonant with this language, the Supreme Court has rejected "the notion that immediate physical release [is] the only remedy under the federal writ of habeas corpus." *Peyton v. Rowe*, 391 U.S. 54, 67 (1968). Federal courts have "broad discretion in conditioning a judgment granting habeas relief," *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987), and, as a practical matter, the granting of a writ often does not result in either "immediate" or "speedier" release. Pr. Op. at 24. The majority opinion thus declares a standard that is inconsistent with both the language of §§ 2241 and 2254 and our historical treatment of petitions for habeas corpus.

## II

The majority attempts to justify its departure from statute and precedent by asserting that its holding is consistent with congressional intent and the Supreme Court's "strong suggestion" that habeas relief and relief under § 1983 are mutually exclusive. Pr. Op. at 17. But today's opinion misreads the pertinent cases and the Supreme Court's jurisprudence, and it contorts the relationship between habeas and § 1983 that the Supreme Court explicated in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and its progeny.

A.  The proper relationship between habeas and § 1983 is based on the familiar principle of statutory interpretation that "the specific governs the general." *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007). Section 1983 provides a broad vehicle for relief from illegal state action in general, while the writ of habeas corpus is a remedy for relief from illegal confinement in particular. *Preiser*, 411 U.S. at 490.  *Preiser* held that the specific remedy provided by the habeas statute "must override the general terms of § 1983." *Id.*  In other words, when prisoners directly challenge the fact or duration of their confinement, that challenge must be brought under habeas.

The justification for so limiting § 1983 actions is that the habeas remedy is "sufficiently comprehensive" to "demonstrate congressional intent to preclude the remedy of suits under § 1983" for certain claims by prisoners. *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981); *Docken*, 393 F.3d at 1026 n.2.  Those claims, held *Preiser*, are those that are "within the *core* of habeas corpus."  411 U.S. at 487 (emphasis added).  *Preiser* defined that core to contain claims where "a state prisoner is challenging the very fact or duration of his physical imprisonment." *Id.* at 500.  *Preiser* did *not* hold that habeas jurisdiction is confined to what it described as the "core" of habeas; had it meant to do so, its references to the "core" of habeas corpus, as distinct from the overall reach of the writ, would have been pointless.  *Preiser* reinforced the limited nature of its holding by cautioning that the exact scope of the overlap between § 1983 and habeas was "not before us," *id.*; had *Preiser* meant the "core of habeas corpus" to equate with the entire breadth of the writ, that caution would have been unnecessary.  And as Justice Thomas noted in his dissent in *Skinner v. Switzer*, 562 U.S. 521, 538 (2011), the Court "has

never purported to fully circumscribe the boundaries of § 1983," as distinct from habeas corpus.

The justification for limiting § 1983 out of consideration for habeas does not work in reverse. The existence of a broad statute does not imply a congressional desire to limit a more specific one, especially one largely enacted later.[4] "[T]he specific governs the general," *Long Island Care*, 551 U.S. at 170, not vice versa. Consistent with that precept, the Supreme Court's cases since *Preiser* have focused on whether and to what extent § 1983 should be limited by habeas, not the other way around. *See, e.g.*, *Dotson*, 544 U.S. 74, 81 (2005); *Skinner*, 562 U.S. at 534.

The majority opinion maintains these cases should be seen as "strongly suggesting" that habeas and § 1983 do not overlap at all, even as to asserted violations of constitutionally required procedures that, if corrected, could — but will not necessarily — result in earlier release. Pr. Op. at 16. This reading of the precedents relies primarily on three Supreme Court cases: *Muhammad v. Close*, 540 U.S. 749

---

[4] Section 1983 was enacted in the Civil Rights Act of 1871 and has existed in largely the same form to this day. *See Preiser*, 411 U.S. at 476; Civil Rights Act of 1871, ch. 22, 17 Stat. 13 (1871). Although there was a federal habeas statute before 1871, it was initially much more limited than the modern statute and has been amended many times since. *See generally Federal Habeas Corpus*, 83 Harv. L. Rev. 1038, 1042–93 (1970) (providing an overview of the history of federal habeas corpus). These amendments include legislation in 1966 inserting language that the Supreme Court noted "seem[ed] specifically to contemplate the possibility of relief other than immediate release from physical custody." *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) (discussing the 1966 amendment providing for "release from custody or other remedy"); *see also* 28 U.S.C. § 2243 (providing for disposition of habeas cases "as law and justice require").

(2004), *Dotson*, 544 U.S. at 74, and *Skinner*, 562 U.S. at 521. None of these cases focuses on limitations on habeas claims. Instead, each of these cases deals with limitations on actions brought under § 1983. *See Skinner*, 562 U.S. at 534; *Dotson*, 544 U.S. at 81; *Muhammad*, 540 U.S. at 754–55.

Nor does the dicta in the three opinions regarding habeas cases, read in context, support the majority's reading of the cases. For instance, the majority cites *Muhammad*'s statement that the claimant "raised no claim on which habeas relief could have been granted on any recognized theory," and that the relief he sought would "not necessarily" have affected the duration of his confinement, to argue that habeas is not available for claims unless they *necessarily* challenge the duration of confinement. Pr. Op. at 13; *Muhammad*, 540 U.S. at 754–55. But in *Muhammad*, the lower court had "expressly found or assumed that no good-time credits were eliminated by the prehearing action Muhammad called in question." 540 U.S. at 754. In other words, there was not even the *possibility* of speedier release if Muhammad prevailed. Muhammad sought only compensatory and punitive damages for an alleged wrongful disciplinary action. *Id.* at 753. *Muhammad* thus does not suggest anything at all about a case in which the duration of a prisoner's confinement *might* be affected by a prisoner's claim.

*Skinner* and *Dotson* are similarly indeterminate, at best, as to potential limitations on habeas jurisdiction. Both cases concern whether a claim "may" be brought via § 1983, not whether it "must" be so brought because habeas is unavailable. *Skinner*, 562 U.S. at 524; *Dotson*, 544 U.S. at 82. Notably, *Dotson*, in explaining why the § 1983 claims there at issue could go forward, reprised the *Preiser* standard: "Because neither prisoner's claim would necessarily spell

speedier release, neither lies at 'the core of habeas corpus.'" *Dotson*, 544 U.S. at 82 (quoting *Preiser*, 411 U.S. at 489). *Dotson* did *not* say, any more than did *Preiser*, that because of the character of the prisoner's claim, they were outside the scope of habeas corpus altogether.

*Skinner* confirmed that limitation on the observation in *Dotson* regarding habeas, stating that "[w]here the prisoner's claim would not 'necessarily spell speedier release,' . . . suit *may* be brought under § 1983." 562 U.S. at 525 (emphasis added). Like the language quoted above in *Muhammad*, the statement that such claims may be brought via § 1983 does not suggest that they may not be *also* brought in habeas.

Further, *Boumediene v. Bush*, 553 U.S. 723 (2008), a case the majority does not mention, affirmatively indicated that habeas petitions may be brought for relief other than speedier release from confinement. *Boumediene* considered the core capacities that a tribunal must retain to maintain an adequate substitute for a writ of habeas corpus. *Boumediene* noted that while a court "must have the power to order the conditional release of an individual unlawfully detained[,] . . . release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted." *Id.* at 779.

The year after *Boumediene*, and just two years before *Skinner*, the Supreme Court characterized *Dotson* as holding that "prisoners who sought new hearings for parole eligibility and suitability *need not* proceed in habeas" — which would be very odd phrasing if *Dotson*'s import was that prisoners with such claims *cannot* proceed in habeas. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 66 (2009) (emphasis added). And throughout these cases, the Court has asked consistently whether a claim "lies at the *core*

of habeas corpus," (emphasis added) phrasing that, as I observed earlier, necessarily indicates there is some area beyond this "core" in which a habeas claim may also lie. *See, e.g.*, *Dotson*, 544 U.S. at 79 (quoting *Preiser*, 411 U.S. at 487) (internal quotation marks omitted).

To counter all of this precedent, the majority opinion (and, in part, Judge Hurwitz's concurrence) rely on three words in a *Skinner* footnote that could, out of context, suggest that habeas is limited to its "core." Quoting the same *Dotson* passage discussed above, *Skinner* states that "when a prisoner's claim would not 'necessarily spell speedier release,' that claim does not lie at 'the core of habeas corpus,' and may be brought, if at all, under § 1983." 562 U.S. at 535 n.13 (quoting *Dotson*, 544 U.S. at 82).

Perhaps the phrase "if at all" could be read to suggest that such claims may *only* be brought under § 1983, and therefore may not be brought under habeas. But this language could also be read to refer simply to whether the claim may be brought at all — i.e., whether the claim is otherwise viable. So, for example, a claim cannot be brought "at all" under § 1983 if the statute of limitations has run, or if the procedural requirements of the PLRA have not been complied with. *Cf. Dotson*, 544 U.S. at 87–88 (Scalia, J., concurring) (enunciating a similar caveat). On that understanding, the *Skinner* sentence means that *otherwise viable* claims not at "the core of habeas corpus" may be brought under § 1983 — not that they must be.

Ambiguous dicta in a footnote is not enough to resolve the precise boundaries of habeas corpus and § 1983 — an issue the Supreme Court has explicitly noted and left unresolved for more than four decades, and that the Court

several times has indicated does *not* lie at the boundary between claims that *could* result in earlier release and those that *will*. *See Preiser*, 411 U.S. at 500. That same footnote, as well as *Dotson* itself, asserts that the Court has not "mov[ed] the line our cases draw," confirming that neither *Dotson* or *Skinner* reached any new conclusions as to that line. 562 U.S. at 535 n.13 (quoting *Dotson*, 544 U.S. at 84).

*Skinner*, *Dotson*, and the other relevant Supreme Court cases are thus entirely consistent with the notion that § 1983 actions should be limited out of a concern for encroaching on habeas jurisdiction, but that it is permissible for habeas actions to overlap somewhat with claims properly brought under § 1983. The Fifth, Sixth, and D.C. Circuits have held that there is some degree of permissible overlap between § 1983 and habeas. *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1033 (D.C. Cir. 2014); *Adams v. Bradshaw*, 644 F.3d 481, 482–83 (6th Cir. 2011) (per curiam); *Coleman v. Dretke*, 409 F.3d 665, 669–70 (5th Cir. 2005) (en banc) (per curiam). *But see Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006); *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004).

B. In addition to its reading of Supreme Court precedent, Judge Ikuta's opinion, in a discussion joined by only a plurality of the court, asserts that its position is consistent with congressional intent. Pr. Op. at 17–18. But that discussion points to no language in the habeas statute supporting the standard it announces today. Instead, it suggests that by requiring one set of procedures for § 1983 claims under the Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e *et seq.*, and another set for habeas petitions brought pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214,

Congress indicated its intent to have the two statutes govern entirely separate regimes.  Pr. Op. at 18–19.

The existence of distinct sets of procedures does not tell us that Congress intended to limit either procedure's *substantive* scope.  Rather, the evident intent was simply that to use either statute, a litigant must meet its procedural requirements.

Even if more could be made of the procedural dissimilarities between § 1983 and federal habeas corpus — which I do not think it can — the plurality gives no reason to think that it is *habeas* that should be limited, rather than § 1983.  As I have noted, § 1983 has been the focus of all prior cases addressing the overlap between the two.

The plurality's reliance on the PLRA and AEDPA is also ahistorical.  *Preiser*'s discussion of habeas and § 1983 was written in 1973, well before either the PLRA or AEDPA were enacted in the mid-1990s.  Congress is generally assumed to be "thoroughly familiar with" Supreme Court precedents when it legislates.  *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 117 n.13 (2002) (quoting *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995)).  If Congress had intended to weigh in on the longstanding discussion concerning the relationship between habeas and § 1983 via the PLRA, AEDPA, or both, it would surely have done so explicitly, rather than relying on judges' ability to read tea leaves.  Absent any provision in either statute addressing the question, the creation of different *procedural* requirements for the two different claims cannot be read to limit the substance of the habeas remedy.

More broadly, the PLRA's restrictions on prisoner suits demonstrate the hazards of limiting habeas corpus due to

potential overlap with other remedies. The writ of habeas corpus is protected by the Constitution. *See* U.S. Const. art. I, § 9, cl. 2. There is no such explicit protection for the remedy afforded by § 1983 (which, indeed, did not even exist until after the Civil War). As the PLRA shows, Congress can alter § 1983 at will, to make it more or less available to particular groups like prisoners. Relying on the existence of alternative statutory remedies to justify narrowing the breadth of habeas thus may create gaps that widen over time as Congress alters those remedies. This potential problem is made more likely if we read the existence *vel non* of other statutory schemes to indicate Congress's implicit intent to limit habeas's scope. Such an arrangement risks encroaching on the "grand purpose" of one of the most important remedies of our legal order. *Boumediene*, 553 U.S. at 780 (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

## III

The majority's opinion also threatens the scope of habeas for federal prisoners. Such prisoners do not have recourse under § 1983. That statute applies only to violations undertaken "under color of" state law. 42 U.S.C. § 1983; s*ee, e.g.*, *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257 (9th Cir. 2008).

The federal habeas statute, 28 U.S.C. § 2241 *et seq.*, is the basic statute empowering courts to hear petitions by both federal and state prisoners.[5] Notably, we have heard many

---

[5] Section 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." Section 2241(c) specifies five categories of prisoners eligible for federal habeas. *See*

claims by federal prisoners petitioning under § 2241 where
success "would not necessarily lead to [their] immediate or
earlier release from confinement." Pr. Op. at 25. In *Crickon
v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009), for instance,
Jerry Crickon, a federal prisoner, brought a habeas petition
challenging the BOP's determination that he was
categorically ineligible for an early release incentive program
due to his prior conviction. We held the BOP's failure to
articulate its reasoning was a violation of the Administrative
Procedure Act, and remanded for the BOP to reconsider
Crickon's eligibility. *Id.* at 988–89. Just as in *Dotson*,
"[s]uccess for [Crickon] . . . mean[t] at most new eligibility
review." 544 U.S. at 82. But that was no obstacle to
Crickon's habeas petition.

In *Close v. Thomas*, 653 F.3d 970 (9th Cir. 2011), we
heard a similar challenge brought by a federal prisoner under
§ 2241. Christopher Close, the petitioner, challenged the
criteria used to rank prisoners on a waitlist for a drug
treatment program, because admission to the program could
speed his eligibility for early release. *Id.* at 972–73. As the
opinion noted, *id.* at 975, the potential acceleration of
participants' release was discretionary — in other words,
admission to the program "*would not necessarily* spell
immediate or speedier release." *Dotson*, 544 U.S. at 81. But

---

28 U.S.C. § 2241(c)(1)–(5). The important section for present purposes
is 2241(c)(3), which makes available writs of habeas corpus to both
federal and state prisoners "in custody in violation of the Constitution or
laws or treaties of the United States." Sections 2244, 2254, and 2255 spell
out some substantive differences in the writ's scope for state and federal
prisoners, as well as differences in the procedures required for state and
federal prisoners to obtain the writ. Those differences are not relevant to
the case at hand.

Close's claim was allowed to proceed via habeas petition nonetheless. *See also Rodriguez*, 2016 WL 3003423, at 4.

As *Crickon*, *Close*, and *Rodriguez* indicate, federal prisoners have been able to bring habeas claims alleging procedural defects to the parole process whose resolution would not necessarily result in a speedier release. This practice is longstanding. *See, e.g.*, *John v. U.S. Parole Comm'n*, 122 F.3d 1278, 1285 (9th Cir. 1997); *Benites v. U.S. Parole Comm'n*, 595 F.2d 519, 520 & n.1 (9th Cir. 1979); *see also Elliott v. United States*, 572 F.2d 238, 239 (9th Cir. 1978) (per curiam) (holding that a federal prisoner's challenge to a parole board's failure to give "serious consideration" to an application for parole is properly brought via habeas corpus).

Such cases will, presumably, continue to be allowed, as there is no alternative statutory remedy for federal prisoners, and so no possibility of statutory overlap. But the majority opinion points to no statutory language or precedent that suggests any difference in the substantive scope of habeas between federal and state prisoners for alleged constitutional violations. Nor does that opinion otherwise explain why the reach of § 2241(c) for federal prisoners should differ from the reach of the same statute for state prisoners.

\* \* \*

For all the reasons discussed, I would hold that habeas corpus relief is available to any claimant whose success "could potentially affect the duration of their confinement." *Docken*, 393 F.3d at 1031 (emphasis omitted). Such an approach is just as practically feasible as the standard in the

majority opinion.    In particular, it does not rely on the "probabilistic analysis" that opinion rejects.  Pr. Op. at 22.

My approach would, to be sure, permit some overlap between habeas and § 1983, although this case does not require us to decide the exact extent of that overlap.  But such overlap is not cause for concern.  To succeed under either statute, prisoners will have to conform with the requisite procedures.  The state has given us no reason that it would be better off in general if cases like this one were brought under § 1983.  If anything, state governments usually argue for more cases to be brought in habeas rather than under § 1983, as federal habeas petitioners, unlike plaintiffs under § 1983, are usually required to exhaust state judicial remedies, *see Osborne*, 423 F.3d at 1053, and federal habeas courts are often required to defer to the results of these state proceedings.  *See* 28 U.S.C. § 2254(d).

Notably, the rule adopted by the majority will not "give needed clarity to state prisoners."  Pr. Op. at 22.  That rule departs from precedent and statute, and will generate confusion and delay among those seeking adjudication of their claims who mistakenly choose the wrong vehicle.  When it comes to alleged procedural violations in particular, the majority's announced rule would seem to sweep up a significant number of claims within its reach, creating a trap for unwary prisoners who have not satisfied the PLRA's distinct requirements.  *See* 42 U.S.C. § 1997e.

In short, the majority's standard, inconsistent with statute and precedent, will unnecessarily create problems for years to come.  I therefore dissent.